along with my co-counsel and mentor, Rob Stephens. We are here today, Your Honors, to request that you reverse the decision of the verdict of the Billings court and jury in this case because Mr. Stanley was denied his right to cross-examine a dead informant. And as a result, we feel that he has been his case was compromised because testimony was allowed in through tape recordings, also through the testimony of the jury, and we feel that he has been denied his right to cross-examine a dead informant. The questions of those tapes constitute a testimonial process. Kennedy. What in the testimony that comes through the tapes are you objecting to? You're not objecting to statements by Mr. Stanley, I take it, since those would be admissions, would they not be? I have to agree with the Court that those are admissions of Mr. Stanley. However, I think taken in the context of Mr. Thorell, who was the confidential informant, I don't think that the tape should have been admitted. Well, how were these presented to the jury, that they should take the information from the informant as offered to the truth, or what were they offered to the jury? I could give you some examples, Your Honor, on their transcript is replete, but I do have a few page notations for you to refer to. And on page 93, that the agent is testifying that Mr. Stanley or that the confidential informant told them that Jack Stanley was one of the people that he was talking about. Wait. Are you reading from 93 of the? Of the transcript, Your Honor. Well, what in the tape? That's the tape was played. Your question is with regard to the tapes. I'd like to sort the tape out first. In other words, the tape was played to the jury, correct? The tapes were played to the jury. They were also given transcripts that had been prepared by the jury. And told that the tape was the better evidence. Correct. Okay. So now Mr. Stanley's heard on the tape, and you said that that's admission, that's not hearsay. So the confrontation comes as to whether or not the testimony that came through the tape is hearsay in the first instance, correct? Correct. Okay. So why is it hearsay? What was it offered for? It was offered for the – there were several of those statements that were offered for the truth, Your Honor. Okay. For instance – And you were going to give me an example from the tape. Exactly. What was offered for the truth? In one of the instances, Mr. Thorell is back in the car with the government agent, and he says that Mr. Stanley has gone to get the pills. He has – he also makes another statement. The agent is asking him, did you give him the money? No, he went to get the pills. That is on the tape. And that was – then the jury was allowed to hear that. We believe that that falls under the testimonial portion, as well as various other statements that were made in the tape transcripts. There were – Excuse me, but when that – one example, just to pursue it, to get a flavor for how this came in, was there any limited instruction to the jury on what they should – how they should treat the statements of the confidential informant? Not to my recollection, no. So there's no limitation that says that they should not – they should disregard or not take into account the statement, he went to get the pills? Not to my recollection, no. Can you tell me where that is? That portion would be on page – I have it on page 96, but that – now I don't have the tape transcripts. We don't have the transcripts, Your Honor. I believe it would have had to do with the February 6th transaction, and the tapes are in the – the tape transcripts are in the government's – This is – this is the transcript of a – of what was going on in court. Correct. Okay. Your Honor, while you're reading, I forgot to announce that my co-counsel will be doing part of this argument. We will be reserving five minutes for rebuttal. We would be asking you to look at the U.S. v. Cromer, which is a Sixth Circuit case, and making your decision here today, and use the three-part constitutional Confrontation Clause analysis that was adopted in Cromer to help you identify certain of these conversations that are on the tape as testimonial and that they should not have been allowed. Were these objected to at the time? Yes. There was a – we had a – Your Honor, we had filed a motion in – I know there was a lot of dispute about it. Yes. At the time of the tape, was there an objection? Yes. There was an objection, I believe, at the beginning of every tape. We had – That's fine. I understand. Objections throughout. Okay. I think that the government's brief to this Court is a mis – there is a misstatement where he says that we did not object to the validity – the audibility of the tapes or the validity of them. And, in fact, at page 40 of the transcript, we did make that objection. They use that as one of their arguments of why we should not be allowed to keep the tapes out. We had objected to that. There were a lot of unintelligible portions on those tapes, which made it very hard to understand what was going on. The transcripts that the government had prepared had been altered by the government agents after they had been prepared by another off-site company, and those things were objected to as well. Okay. Let me address – this is on page 96. This is – is this the witness explaining what is on the tapes? Yes, Your Honor. Yeah. Okay. And that occurs on – on several occasions. Mr. Bertain is on the stand. He's narrating what is going on in those tapes and what is being told to him by the confidential informant. He was standing there for a few minutes. Mr. Stanley left, so I waved him over and I asked him, did you give him the money? He said no. And this objection overruled. The witness said no, that Mr. Stanley had gone to – he said no, that Mr. Stanley had gone to pick up the pills. Exactly. I think that the statements that have been made by the confidential informant throughout are implicating Mr. Stanley in criminal activity. Under the Cromer test, Mr. Thorell certainly knew that his position – that his statements would be used against Mr. Stanley if charges were in fact filed, and they were. And I think we can establish that a lot of those statements were offered for their truth and that it is a violation of the Confrontation Clause and it does amount to plain error and there should be a reversal. Okay. Thank you. I will now turn this over to my partner, Mr. Stevens, who's going to argue issues 2 and 3 for you. Thank you. Mr. Stevens, join me now on behalf of Jack Stanley. What time do we have left at this point? You have about 9 minutes. I'm trying to get very quick. The judge ruled, the Article III judge in that trial ruled that the issue of credibility of the deceased informant was irrelevant. He stated in the context of that ruling that there was no reason why we would want to challenge the credibility of the informant because the tape recordings were there and they accurately portrayed the transactions. It demonstrated a fundamental problem with our second argument because if, in fact, the testimony of the confidential informant not only as recorded in an exchange between Jack Stanley but also in exchanges with the agents on the tape are non-testimonial in nature and by definition, the right to cross-examination is an absurd irrelevancy because cross-examination is intended to test the reliability of testimony. One of the critical aspects on the issues that arose at trial was that we knew that the confidential informant had made importunities to Jack. I'm dying. I can't afford money for a transplant. I can't get a prescription for Oxycontin. We gave notice that we were going to seek an entrapment defense. Agent Britton was able to describe for the jury a characterization where there is a generic description of money owed by the confidential informant of Jack Stanley. It's $40. Well, Agent Britton, what was that for? That was a drug transaction, an earlier drug transaction. How do you know that, Agent Britton? Because the confidential informant told me that's clearly testimonial in nature. The entire transaction is being recorded as testimonial in nature. This is my last CJA case that I tried in district court. A judge in this case found that Stevens could not follow the rules and couldn't take no for an answer. The judge was partially correct. I tried over and over to get in this impeachment material because of the entrapment defense and because of the nature of the cooperating arrangement. I didn't know that judges could take away your status as a CJA panel member. Had I known that, it may have impacted negatively my zeal in this case. Contrary to the government's position, we made every appropriate recommendation or objection. We made three pretrial motions. We objected to the reliability of the tapes. We objected to the entire process of chain of evidence. The judge could not be established without reliance upon hearsay. It's a fundamental element of proof. They had to rely upon what the informant was saying. He was an addict. He had sources other than what he was purporting to get from Jack Stanley. He owed even died from OxyContin. He was never signed up by the DEA. He had a special arrangement to compromise or keep him out of prison on state pending charges on multiple forgeries, all of which were irrelevant to his credibility. If we were to consider only the admissions that were made by your client himself and just excise basically everything that the confidential informant said separately, wouldn't the jury have come to the same conclusion because his statements were self-incriminatory? Well, we don't know because we were never able to develop the entrapment defense because of the limitations on cross-examination and the ruling of the district judge that the credibility of the informant was irrelevant. Well, so I guess my question is kind of a harmless error question in view of his admissions, even if the jury had said, well, this other guy is just kind of a lying sleaze, but here he is admitting all this stuff anyway, so what difference does it make? I think you apply a plain error analysis. The cross-examination issue is a backup so that if you choose to apply a harmless error analysis, I don't think that that is valid because of the impact on the defense that was being urged by the defendant for the jury. It's similar to those cases that are cited in our brief where the defendant is saying somebody else did it, well, that isn't exactly what they're doing, but we're saying if we did it, it was excused. So just so I understand, what you're arguing is that the agent was allowed the tape and the agent were allowed to put before the jury the elements of this transaction. Some of the, as your co-counsel indicated, some of the statements were in fact incriminatory on their face by saying he went to get the pills. Okay. So your argument is that with respect to, first of all, that was hearsay for Bretton to state it, and then you're saying insofar as impeaching the source of the, the original source of the statement, the deceased, the dead confidential informant, that you wanted to show that separate and apart and outside what you could pick up from the tape or from any testimony about it that he did things, said things that were entrapping Stanley to get him to go through with this transaction. And if you could have impeached the informant's credibility, what, how would that have proved the entrapment? That's what I'm not sure. Well, a couple of situations.  Second of all, Agent Bretton was able to testify about predisposition testimony based solely upon. I understand. But what is it about the informant's credibility that's going to figure into this mix? You may have a problem with what the agent has been allowed to testify to. The question I'm trying to address is where's the error, where's the linkage on the entrapment theory by not allowing you to impeach the credibility of the informant? We felt that we could show that the informant had a strong motivation to fabricate, and we could also elicit from the informant the special consideration that he received from state prosecutors to keep him out of jail. So if he would get Stanley, this was a target operation and a recruitment, contrary to the assertion of the government, a recruitment of an unacceptable informant under DEA standards in order to target a specific individual. And the history of that, I think, was developed very limited in the court below. But that is the issue of entrapment. Obviously, that was not adequately clarifying. I believe that the oxycodone quantity issue is adequately briefed and does not need to be addressed orally. Is that affected by Blakely? It is, I think. The government seems to think it is. Yes. And I wouldn't disagree with that because it was a consideration of penalty enhancement without a jury determination. Thank you. May it please the Court, counsel. My name is Jim Sikora. I'm an assistant United States attorney. I was given this case a few days before trial. I was trial counsel and I'm still counsel. Your Honor, you hit the nail on the head. After Crawford, this was a pre-Crawford case, but after Crawford, I think all discussions began whether it's testimonial or non-testimonial. The motion that was made by the defendant prior to trial was that the tapes themselves were absolutely inadmissible for various reasons, including the dead man statute and other things. Judge Siebel in the lower court looked at it, citing the appropriate cases and said there's a guarantee of trustworthiness here. We're going to take a look at it. At trial, the United States, through the agent, established that the tapes were monitored by him and other agents. They were done through the informant. Over 30 phone calls were provided in addition to body wires of the meets. During those meets with the defendant, they had eyeballs on the guy, not all the time. But getting to the point very quickly, Your Honor, to answer your last question, interrupting my argument about the issue, you may have a problem with what the agent said in the stand as opposed to the tapes. Right in the tapes, Mr. Stanley is heard saying, I'm going over to my house. And before the judge and the jury, we ask that we skip ahead six minutes of the tape rather than listen to six minutes of silence. And there's an explanation that they saw him leave the parking lot and come back. And within the context of when the agent said, he told me. Well, his going to the house doesn't prove anything. I know. It's not. But it does if the agent's then allowed to testify that he said, and it wasn't picked up on tape, or he's commenting on why he's going. He's going to get the pills. And the defendant did that. He said, I'm going, and I'm coming back. And that's when they. He didn't say, I'm going to get the pills, did he? I believe it is. I'll have to check the exact record. Well, the quote that was referred to is the agent saying, I'm not clear whether he said it on tape or he, that is that he. And you're looking at page 95 and 96. Yes. Is that on the tape? He's saying. It's on the tape. And that's why we put it on there. So it's a record. I'll find it for you. Yeah. So he was making a testimonial statement out of court about what the defendant was doing. That's a testimonial statement. That's subject to processing. That's a potential. I mean, you know, how do we know that the guy's telling the truth? Maybe he's decided to set him up. The guy's going off. Whatever. I mean, that's fair game for Cross, isn't it? I think it is. But in the grand scheme. And you were offering it for the truth of the matter, correct? It had to be. What's the relevance to say he's going to get the pills? It was in the context. It was in the context of a conversation. I mean, of a taped conversation. And so what did, on the tape, did he say he's going to the house to explain? It was referenced by the house. I think it's that specific. I'm leaving. I've got to go to my house. My house is over there. And so the C.I. says on the tape he's gone to get the pills. And Stanley. Stanley said the same thing. That's what I'm. I just take, since we don't have the exact words, I'm just trying to understand your position, okay, under whether this is testimonial, non-testimonial, whether it's hearsay, non-hearsay. I'm just trying to get a bracket for this thing because it's a little slippery on your problem. Let me just ask this. There's a conversation that leads up to Stanley saying I'm going to my house, and he's gone for six minutes. Now, the inference, absent any commentary, is he's gone to get the pills, I assume, because they've been talking about OxyContin, right? Right. Okay. But on the tape, the informant is heard to say, arguably, let's assume for my question, that he says, okay, he's gone to get the pills. Now he's narrating. He's not in a conversation. He's now commentating on what Stanley is presumably doing in this six minutes of absent silence. That is testimonial, is it not? Arguably it can be, but I don't believe it is, Your Honor. To establish before the jury the context of which, again, when you look at the cold transcript, you're saying the tape is played, but if you go to continuity, all of it is played. To do context. Testimony is used to establish context. And the jury had just heard Mr. Stanley say that he was leaving. Then why did they need to put in, why can't you excise the statement about what his purpose in going to the house is? I don't know that that was on tape, Your Honor. I think that actually the agent talked about what he told me. In court? Yes. Okay, so in court now the agent is saying, what, he's now testifying about what he observed? See, that's what I'm asking. I'm not understanding your argument. I'm trying to break this down as to what, with a dead informant who can't be cross-examined, because usually, yes, tapes come in, yes, there's context, but there's also the informant available to be subpoenaed and brought as a witness. And then one disputes whether or not he's unavailable or not. But I'm just trying to understand, in this case, was the agent on the stand saying, that's why there's a gap or that's why we're skipping ahead? He is now describing what Stanley's purpose of leaving was. Not the purpose so much as the context that he was leaving. I mean, six-minute gap. What was said on the tape after he returned? I was going to grab the transcriptor on it if I could do it while I'm. That's when they have the exchange that takes place with the observers looking at it, and it's not until after Stanley comes back. And, once again, setting this up, they had the informant wired, they had searched the car, there's surveillance. They're not able to surveil Stanley all the way over when he comes back. And then they don't lose sight of the informant when this. Look, I just had a case where it was all on tape. It was all on tape. But what was going on inside the backseat of the car was critical. Who touched, who opened the package, who did what? Okay. So, yes, it was on tape, but not the visual. It was an audio tape. So when you start having somebody filling in the surround, if you will, you now have testimony that's adding content, not just context, but content, incriminating content. And I'm trying to understand whether on this tape the CI did that by describing behavior or whether the agent's doing it as a little editorial on the stand when he's testifying. As an observer, as a precipitant witness, maybe he's okay, he's there subject to car contamination. He's safe. I can see that he walked from his car into his house. But can he say, as a precipitant witness, inside that house he got the pills? No. Because he doesn't know what he got inside the house. He can testify to what he observed. And he didn't say that he went and got the pills, Your Honor. So that's what I'm trying to say. Okay. And I think the tape before and the tape after Paris set out, including the fact the informant never had any, the only contacts he had was with Mr. Stanley. And after Mr. Stanley had come back, the transaction occurred here on the tape, and he comes back and brings the pills to him, Your Honor. Is this the officer, he's asked, did you then have a conversation with the informant after he got out of the vehicle? Is that who's testifying? And the officer says, yes, he was standing there for a few minutes and Mr. Stanley had left. So I waved him over and asked him, did you give him the money? And he said, no. Objection, Your Honor. Hearsay overruled. He said, no, that Mr. Stanley had gone to pick up the pills. I said, okay, stand back over there. And so did Mr. Stanley then return five or six minutes later? It was a short time later. Yes. And the items, he came back into the vehicle and the items were turned over to him. And once again, the argument is to put it in the context of what was happening with the tapes. And you read the transcript. Your argument, it also sounds a little bit like, again, a harmless error argument, because whether the officer had said he went to get the pills or he didn't, the guy left, he came back, and then they exchanged pills. And I didn't argue a harmless error because a harmless error only comes if it's improperly introduced to the tapes in the first place. That's why I was focusing on the first place. Yes. Yes, Your Honor. Thank you. But getting to some of the issues that were raised regarding the ‑‑ there's this compendium of tapes. Included in there is the defendant making these admissions. Whether it be an adoptive admission, he's talking about, I owe $40 or not. I disagree with Mr. Stevens' suggestion that the agent was able to say that there was a former drug debt. You hear this on the tape. He goes by his $100 worth of pills. He gives him $140. The defendant is talking about, you owe me this extra $40. Whether it's for a former drug transaction or not, that's what you hear. He obviously owed him. It was clear from the jury in listening to the tapes that he was comfortable with meeting the informant, with talking to him, discussing these things. The other manner in which these conversations are missful, not only Stanley, but also the informant, is co‑conspirator statements on the tape in at least three different locations. Stanley says at one time, the guy comes in, I get $100,000 at a time. I buy him for $8 or $9 or $10. Co‑conspirator statements, Stanley allying somebody that he's selling to. There's numerous reasons in which these tapes themselves are admissible. You don't even have to go to the question beyond Crawford. The next issue that counsel talked about is the, once again, Britton talking about the various aspects of his testimony. And we argue, very frankly, and I went through it again last night looking at the ‑‑ and that's why we put Britton's entire testimony in the supplemental excerpts of record. What they're arguing and what they really aren't. On some occasions he's asked, what does D mean? It's an assist of the jury. It's nothing testimonial in nature that's going to rise or fall just so that they can determine the facts. What does swabbed mean? Swabbed out. What does wired mean? Things of this nature. To aid and assist the jury. What is your response to the defendant's argument that it was impossible to make the entrapment defense fly without having the ability to question the confidential informant? Well, when I think of that as what Mr. Stevens admitted to this morning, arguably issue one and two hangs upon what I started with was testimonial or non‑testimonial. If it's non‑testimonial, then there's nothing to impeach. There's nothing to put in as far as entrapment. He's entitled to call witnesses, if he wishes, which he did, deputy county attorney, to show what kind of deals were made. I think, very frankly, Judge Siebel in the lower court in the trial court went way beyond what he was allowed to do to show that the informant, although it was not testimonial what was put in, that he had a felony record that he died of an overdose, that he was dying of certain ‑‑ he died of HIV. Trying to lampoon, in essence, but since it wasn't testimony, we objected. The court, I believe, let him go further than was allowed in introduction of testimony as to the informant. But none of that should have come in because he did not testify. It was not testimonial, Your Honor. Well, of course he didn't testify. But let's suppose ‑‑ I think the issue that we're trying to wrestle with, whether the informant testifies or not for whatever reason, if their defense is that the informant set the guy up, how are they going to prove that? You say they went too far in letting him impeach the bona fides of the informant, his character, whatever. I don't think that's before us and I don't see what the error is under the circumstances in any event. If that's what you're trying to prove, that this guy had all sorts of motivation to, yes, get Stanley on tape, but push him into something that he wouldn't otherwise have done. Now, that's what I think the issue is. He had other avenues to approach it. Well, apparently he tried to do that and the judge let him do it. Let him do it to an extent. But he's relying solely upon the cross-examination of the agent, which was either outside the scope of the agent's knowledge or it was other people that had it, Your Honor. Mr. Stevens could have called those witnesses. I think I've covered issues one and two. Issue three, I think, is a government question, issue one and two. The issue three, I think, is the Dicey issue. I've stated in the brief that there are Blakely M line issues in this particular case. There were four counts. He only counts one and two. He was acquitted on three and four. And at sentencing, there was acquitted conduct and relevant conduct. The current status of the law on the Ninth Circuit with Amalai, we asked and suggested that supplemental briefing be done or that. Well, the Supreme Court raises a question. We have some law that this is a fairly lengthy sentence. Or isn't it? Fairly lengthy sentence. Lengthy. The question becomes what do we do? Whether we defer a decision ourselves or whether we send it back. Under our law, we would some time ago have sent it back or have kept it. Do you have any antennae as to when the Supreme Court is going to be down? I do not. I do not. I respect that. But the defendant with his 41-month sentence approximately has two years under his belt right now. Based upon his previous record in his criminal history category 5, I doubt that he's going to, I assume that he's going to serve the majority of that, but he might.  I would defer it. I would defer it. I think the current status of the law and the way I calculated that, Your Honor, is that he would be, instead of a 14, he'd be a level 12 with criminal history category 5, I think it's 27 to 33 months, would be the range. I mean, he's already served 24 months of that. I can't tell you exactly how long he's serving. I don't know. He was in approximately, Your Honor. Once again, to reiterate that this is clearly a, all of the cases, including those that we've, post-Crawford, counsel submitted the Sixth Circuit case. I submitted two additional cases last Friday, the Harlan P.A.R. L.E. case and the Levitt case, that the, clearly once the smoke clears, everybody is once again defining what's testimonial and not testimonial. And most recently, the Ninth Circuit has indicated that in those particular cases, the significance of what you look at for testimony, whether or not it's potentially before an interrogation by police or knowing the circumstances under which it's going to be presented in the future. I believe that all of the evidence does not show that Crawford is applicable, that the tapes themselves were admitted properly, and that replete, we were offering the informant's language on the tape. How do you offer it if you redact it? It makes no sense to it. It wasn't for the truth of the matter, but it occurred in the proper context in which these matters occurred, Your Honor. Thank you. Thank you. We'll answer the question and the rest in July of 2002. Shortly after his indictment, he was incarcerated pretrial until his conviction in August. He was sentenced in the fall and remains incarcerated at this time, which is something over 30 months. So he's served 30 months already? Yes. That's from 2002, 2003, 2004. That's 24 months in July, and here we are in January of 2005, so about 30 months. If this testimony is not testimonial, what else is it? The new cases cited by this circuit identify a written statement in a diary that is distinguishable clearly on the face. It recites an excited utterance by a victim. The distinguishing factors that the court found to determine those things trustworthily are the very factors that are absent here. You identified absence of contemplation of litigation. You identified absence of motive to fabricate. You identified a removal of the written documents as being a well-recognized exception to the hearsay, and in each case we avoided an application of Crawford that might be retroactive. We're saying in this case we don't need a retroactive application of Crawford because the Crawford record was made below when we objected to the hearsay of the  So we're saying that there was a contradiction in anticipation of an entrapment defense, that had you been informed that some money was owed to Mr. Stanley, objection overruled. What was your understanding that money was for? Answer, it was purchase of drugs. Honor, object, overruled. Okay. It was for a previous purchase of drugs by the CS for Mr. Stanley. So in preparing for the meet, the meet occurred, the point is that that is clearly testimony, and the transcripts of these undercover operations cannot be divorced, cannot be divorced. What was the citation? I was referring to transcript trial, page 51, where that exchange occurs. The expediency of suggesting that an admission against interest exception authorizes the use of testimony on the nature of a CS simply isn't justifiable. The First Circuit has conducted that analysis and concluded by definition confidential informant testimony is testimonial. If you apply that rule and if this testimony of the CS and the characterizations and descriptions of what the CS told the investigating officers, which was in turn related to the jury, is testimonial, then there is a plain error rule. Confrontation clause has been violated and the reversal is not sustainable or the conviction is not a sustainable, reversible error. Thank you. We got the point. All right. Thank you. The case just argued is submitted for decision. Before hearing the next cases, the Court will take a ten-minute recess. All rise. This court stands in recess. Thank you.
judges: Schroeder, Graber, Fisher